*Miranda S. Kadish v. Craig M. Kadish*
No. 275, Sept. Term, 2021
Opinion by Leahy, J.

**Family Law > Child Custody > Discovery Violations > Sanctions**

In a child custody case, the discretion of the trial court to exclude evidence is not only measured by the potential prejudice to the parties, but is constrained by a court's "absolute and overriding obligation to conduct a thorough examination of all possible factors that impact the best interests of the child." *A.A. v. Ab.D.*, 246 Md. App. 418, 444 (2020), *cert. denied*, 471 Md. 75 (2020).

**Family Law > Child Custody > Discovery Violations > Sanctions**

We conclude that the discovery sanctions imposed by the circuit court in this child custody case were consistent with the Maryland Rules and our decisional law. We hold that the circuit court did not err or abuse its discretion by its choice of sanctions because, rather than bar evidence that could bear directly on S.'s best interests, the court safeguarded S.'s "indefeasible right" to have her best interests fully considered. *A.A. v. Ab.D.*, 246 Md. App. 418, 422 (2020) (citing *Flynn v. May*, 157 Md. App. 389, 410 (2004)), *cert. denied*, 471 Md. 75 (2020).

Circuit Court for Baltimore County
Case No. 03-C-18-006784

**CHILD ACCESS**

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 275

September Term, 2021

_____

MIRANDA S. KADISH

v.

CRAIG M. KADISH

_____

Nazarian,
Leahy,
Harrell, Glenn T., Jr.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Leahy, J.

_____

Filed: April 27, 2022

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In considering whether to impose discovery sanctions in the underlying child custody case, the trial court was confronted with a party that repeatedly failed to comply with discovery obligations and court orders. In an earlier case, *A.A. v. Ab.D.*, we explained that the "best interests of the child standard is the leading consideration for the court in deciding whether to preclude a party from introducing evidence as a discovery sanction in a child custody case." 246 Md. App. 418, 422, *cert. denied*, 471 Md. 75 (2020). We held that the court erred in prohibiting mother from presenting evidence "without considering the impact that the sanction would have on the best interests of the children." *Id.* at 447. By contrast, in this case, we conclude that the court safeguarded the child's right to have her best interests fully considered while appropriately imposing a series of escalating sanctions for the recalcitrant party's discovery violations.

Appellant Miranda S. Kadish ("Mother") appeals from an order of the Circuit Court for Baltimore County adjudicating several motions relating to the care of the parties' child, S., in favor of appellee Craig M. Kadish ("Father"). Among other things, the court granted Father sole legal and physical custody, subject to Mother's visitation rights; determined that Mother was in contempt of the Judgment of Divorce; and denied Mother's motion for contempt and retroactively modified Father's child support obligations. Mother presents four questions for our review, which we have consolidated and recast as follows:[1]

---

[1] The questions as presented in Mother's brief are:

"1. Did the trial court err or abuse its discretion in its Order of October 22, 2020 granting [Father]'s Consolidated Motion for Sanctions?

(Continued)

I.    Did the trial court err and/or abuse its discretion by issuing a series of escalating discovery sanctions for Mother's repeated failure to adequately respond to Father's discovery requests, culminating in the imposition of a rebuttable presumption as to S.'s best interests?

II.   Did the trial court err and/or abuse its discretion in finding a material change of circumstances and granting Father primary physical custody and sole legal custody?

III.  Did the trial court err and/or abuse its discretion when it failed to adjudge Father in contempt?

Discerning no error or abuse of discretion, we affirm the judgment of the circuit court.

## BACKGROUND

Mother and Father married on September 8, 2014 and are the parents of S. (or "Child"), who was born in 2015. Mother and Father separated as of March 1, 2018. After the separation, Mother relocated to the State of Nevada, and Father remained in Maryland. A judgment of absolute divorce was entered on July 8, 2019.

---

2.  Did the trial court err or abuse its discretion in its Order of December 3, 2020 when it held the [c]ourt shall apply a rebuttable presumption in the trial that the minor child's best interest would be served by a modification of the Judgment herein to grant [Father] primary physical custody and sole legal custody of the parties' minor child and that said presumption shall be rebuttable by [Mother] only upon presentation of evidence directly bearing on the best interests of the minor child?

3.  Was the trial court clearly erroneous in finding that there was a material change in circumstances since the Judgment of Divorce and it was in the best interest of the minor child to grant [Father] primary physical custody and sole legal custody?

4.  Did the trial court abuse it's [sic] discretion when it failed to find [Father] in contempt for failing to pay child support?"

2

## Separation and Property Settlement Agreement

The parties entered into a "Separation and Property Settlement Agreement" ("Agreement") on June 24, 2019, which was then incorporated, but not merged, into the judgment of divorce. The judgment granted the parties joint legal and shared physical custody of S. "subject and pursuant to the terms set forth in the Agreement."

The Agreement required the parties to consult with each other "regarding the emotional, moral, educational, physical and general welfare of the Child" and gave both parties the "right to participate fully and equally" in making decisions with respect to the "education, medical treatment, illness, operations (except in emergencies)[,] health, welfare and other matters of similar importance affecting the Child." Although each party was charged with making "day-to-day decisions" concerning S. while she was in their physical custody, the Agreement allowed the parties to have "co-equal authority to make all 'Major Decisions,' affecting the Child (i.e., all decisions concerning permanent residence, school/education, summer camp, serious medical care, religious training/upbringing and participation in extra-curricular activities)." To resolve any conflict between the parties regarding any Major Decisions, the Agreement provided for the appointment of a parenting coordinator, who was tasked with facilitating a joint resolution. In the event a joint resolution could not be reached, the parenting coordinator was to "determine the resolution of the Major Decision."

The Agreement broadly contemplated that S. would reside primarily with Mother in Nevada during the school year and with Father in Maryland during the summer. Correspondingly, the Agreement required Mother to "propose a fully licensed and

accredited pre-school for the Child to attend for the 2019-2020 academic year" on or before July 15, 2019, subject to Father's approval, which "shall not be unreasonably withheld."[2]

The Agreement entitled Father to an "access period" of nine overnights each month during the school year and Mother to eight overnights each month during the summer. The parties also received "telephone and/or FaceTime access with the Child not less than once every three (3) days" while S. is in the other party's care.

The monthly travel arrangements for the pick-up and return of S. between Nevada and Maryland at the start and end of each access period were specified under the Agreement. Each May, Father was to "travel to Nevada to pick-up the Child to commence his Summer access period." Mother was required to "both pick-up and return the Child at the start and at the end of each of her access periods in June and July" and to "travel to Maryland to pick-up the Child at the end of Father's Summer access period in August." Father was required to pick-up and return S. at the start and end of his access periods in September, November, January, and March; and Mother at the start and end of Father's access periods in October, December, February, and April. If S. traveled with Mother or Father "by air," the other party had to be notified in writing at least a week in advance.

Among other things, the Agreement also required Father to pay to Mother $2,816.00 per month in child support and to maintain life insurance for S.'s benefit.[3]

---

[2] Father was "entitled to enroll the Child in fully licensed and accredited, non-residential . . . camps" when S. was with Father during the Summer.

[3] Although this is an above-Guidelines case, Father's child support obligation was calculated in accordance with the Child Support Guidelines, Maryland Code (1984, 2019

(Continued)

**Petition for Contempt**

On November 19, 2019, Father filed a "Petition for Contempt and For Enforcement of Separation Agreement, Etc."  In his petition, Father averred that "anticipating ongoing difficulties in attempting to co-parent S[.] with [Mother], [Father] (through counsel) sought to ensure, to the maximum extent possible, that the Agreement's provisions relative to S[.]'s care, custody, etc., were set forth in substantial and unmistakable detail."  Among other issues, Father asserted that Mother: (1) "frustrat[ed] S[.]'s much needed corrective eye surgery"; (2) delayed the appointment of a Parenting Coordinator; (3) failed "to designate any pre-school" or enroll S. full-time in a compliant pre-school until late October 2019; and (4) failed "to have S[.] attend pre-school on at least eight (8) of the fifteen (15) school days" since she began school on October 28.  Father also said that Mother failed to comply with the Agreement's travel and travel notification provisions and did not visit S. at all during "almost four (4) months that [Father] had S[.]'s physical custody."

A few months after filing this petition, on January 7, 2020, Father propounded interrogatories and a request for production of documents.  Father also served Mother with a notice of deposition set for February 13, 2020.  Mother did not respond to any discovery requests and failed to appear for her deposition.[4]

---

Repl. Vol. 2019), Family Law Article ("FL"), § 12-204.  The parties' worksheet was attached to the Agreement and listed Father and Mother's monthly incomes as $27,083 and $5,833, respectively.

[4] Mother was represented by counsel during this time and throughout the underlying litigation except for the period between March 3, 2020, when her prior counsel's appearance was stricken, and June 19, 2020, when her current counsel noted his appearance.

On March 18, 2020, Father filed an "Amended and Supplemental Petition for Contempt and for Enforcement of Separation Agreement, Etc." The amended petition did not assert additional grounds for contempt but provided additional detail to the contentions in Father's prior petition. Mother did not respond to the original contempt petition and failed to respond to the amended petition until June 19, 2020.

**Discovery Dispute Related to Contempt Petition**

On March 18, 2020, along with the amended petition for contempt, Father filed a "Motion for Sanctions and/or to Compel." He alleged, among other things, that Mother: (1) failed to serve answers to interrogatories; (2) failed, despite receiving multiple extensions, to respond or produce any documents in response to requests for production; (3) failed to appear for her deposition; and (4) failed to respond to efforts to reschedule her deposition. Again, Mother did not respond.

On April 9, 2020, the circuit court granted Father's motion, in part, and ordered Mother to respond to Father's discovery requests and produce any responsive documents no later than May 1, 2020. Due to the COVID-19 emergency, the court denied, "without prejudice at this time," Father's request that Mother appear at her deposition.

Rather than answer the interrogatories or produce documents as directed, on April 24, Mother filed a "Motion to Vacate & Dismiss Prior Judgment for Discovery." In her motion, Mother asserted that Father "has filed endless frivolous lawsuits against [Mother] through abuse of power," and that Father "is in contempt of court by failing to pay [Mother] child support while refusing to release shared minor child to [Mother]." The court denied

6

Mother's motion on May 14 and ordered her to "provide written discovery responses and documents as previously ordered."

After Mother failed to provide the discovery first requested in January 2020 and twice ordered by the court on April 9 and May 14, Father filed a "Renewed/Second Motion for Discovery Sanctions" on June 12. Father noted that Mother "had thirty (30) days since the [c]ourt's latest Order compelling discovery, sixty-four (64) days since the [c]ourt's original Order compelling discovery and one-hundred fifty-seven (157) days since [] the discovery requests were served upon her (at a time when she *was* represented by counsel)" but still had not served documents. (Emphasis in original).

On June 19, 2020, Mother filed a response through new counsel who explained that he had just been retained. He requested an additional six weeks to provide the discovery responses. The court denied this request. On July 7, the court granted Father's renewed motion and ordered that the matters sought in Father's first discovery requests, "i.e. proof of all the allegations of [Father]'s Amended and Supplemental Petition for Contempt, be taken as established." The order also "prohibited [Mother] from introducing any matters into evidence so as to attempt to controvert the allegations of the Amended and Supplemental Petition for Contempt." The court clarified that "*the sanctions imposed hereby shall only be applicable to the resolution of [Father]'s Amended and Supplemental Petition for Contempt and not to [Father]'s also pending Petition for Modification (of custody)*." (Emphasis added).

On August 6, 2020, Mother filed a "Motion to Reconsider," and requested the court to reconsider its July 7, 2020 order. While Mother "admit[ted] that her violation of the

7

discovery order was substantive in nature," Mother asserted that the imposed sanction was "overly harsh" and that she was prepared to provide discovery responses by August 31, 2020. She attributed her delayed responses to the withdrawal of her prior counsel and the time necessary to retain new counsel and asserted that the prejudice to Father was minimal as the hearing date was then still three months away.

Father opposed, noting that Mother had been extended "over seven (7) chances and two hundred twenty-four days (224) days" to comply. The court denied Mother's motion to reconsider on August 27.

### Petition for Modification

Contemporaneously with his amended petition for contempt and first motion for sanctions, on March 18, 2020, Father filed a "Motion for Modification" related to the custody of S. Father alleged that "the parties' circumstances have materially changed such that it is now in S[.]'s best interests to be in [Father]'s sole legal and primary physical custody." The alleged changes in circumstances included: Mother's "inability and/or unwillingness" to comply with the circuit court's judgment and the Agreement; Mother's "inability or unwillingness" to provide adequate basic care to S.; and Mother's failure, "intentionally or negligently," to provide S. "opportunities for education and socialization expressly contemplated in the Agreement as necessary to serve her best interests." "Most significantly," according to Father, Mother "voluntarily forfeited some, most or all of her variously scheduled physical custody/access periods with the Child such that since entry of Judgment herein S[.] has actually resided far more with [Father] than she has with [Mother]." Father claimed that S.'s life with Mother "is a maelstrom of uncertainty and

8

chaos, infused with endless illnesses . . . , school absences, . . . care usually provided [S.] by others rather than [Mother], an absence of appropriate socialization activities, etc." After filing the petition for modification, Father stopped making child support payments.[5]

## Mother's Petition for Contempt for Failure to Pay Child Support

On April 27, 2020, Mother filed a "Petition for Contempt" and alleged that Father had not paid $2,816.00 in child support as required by the court's order. In her motion, Mother requested that the court order "jail time to enforce its order." Eventually (as we explain below), Mother's petition for contempt was denied in open court on March 24, 2021.

## Further Discovery Disputes Relating to Father's Motions

On July 9, 2020, Father propounded over 300 separately-numbered requests for admissions. Mother responded to Father's requests on August 10. Mother objected on relevancy grounds to the vast majority of requests for admission relating to the period before the Judgment of Divorce; the validity of the Agreement; whether S. had autism; whether she and S. reside with her second child and the second child's father; and whether this individual provides any financial support.

On August 17 and 18, Father served a second set of interrogatories and requests for production of documents. Mother did not respond. Father also noticed Mother's deposition, this time for October 26, 2020.

---

[5] Mother did not immediately respond to Father's petition for modification. Accordingly, on June 12, 2020, Father requested an order of default. After Mother filed a response to Father's petition for modification, the default was denied.

### i. *Consolidated Motion*

On September 29, 2020, Father filed a "Consolidated Motion for Sanctions Regarding [Mother]'s Multiple Failures to Provide Discovery Relative to Custody Issues." This was Father's third motion for discovery sanctions. Concerning Mother's responses to the admissions requests, Father requested, given "the lack of time between now and trial (with [Mother]'s deposition set for October [2]6) and in consideration of [Mother]'s woeful track-record of non-compliance with [the court's] discovery Orders," that all responses in which Mother "wrongfully asserted 'irrelevance' as a basis for refusal to respond" be deemed admitted. He also requested that Mother be precluded from presenting evidence on facts that she failed to share in response to discovery "by asserting ignorance or lack of recollection." Father also sought an order defaulting Mother from the modification proceeding and precluding her from offering any testimony or "any other evidence" that would have been discoverable pursuant to Father's interrogatories and document requests.

On October 14, Mother filed an opposition in which she requested **seven** additional days to serve her discovery responses. On October 22, no responses having been filed by Mother, the court entered an order granting Father's motion for sanctions. In the order, the court deemed admitted all the requests for admissions to which Mother refused to respond on the basis of relevance. The order also precluded Mother from presenting evidence relating to facts "as to which she avoided responding . . . by asserting 'lack of knowledge' and/or 'lack of recollection.'" The order further excluded any testimony regarding evidence that would have been discoverable pursuant to Father's interrogatories or requests

10

for production of documents "***unless such evidence has direct bearing on the best interests of the parties' child.***"  (Emphasis added).

### ii. *Protective Order as to Deposition*

Six days before her deposition, scheduled for October 20, 2020, Mother filed a motion for protective order and to allow her deposition "by Telephone or Other Remote Means."  Father countered that, because Mother still had not responded to interrogatories or document requests, "it is literally impossible for [Father] to take [Mother]'s deposition remotely and certainly not with[in] the time limits provided by the Rules."  The court denied Mother's protective order, noting that her motion was filed shortly before the deposition date "leaving the [c]ourt and [Father] with inadequate time to consider [Mother]'s request."  Once again, Mother did not appear for her deposition as scheduled.

### iii. *Fourth Motion for Discovery Sanctions*

After Mother failed to appear for her deposition, Father filed a "Fourth Motion for Discovery Sanctions" and noted that Mother did not propose "alternate appearance dates, even though she traveled to, and was in Baltimore, on November 1, 2020."  Father asserted:

> [Mother]'s discovery failures herein are so pervasive and prejudicial to [Father]'s trial preparation that this [court], having exhausted any other available sanctions, should now apply a rebuttable presumption herein that, had [Mother] provided discovery responses as required by the Rules and the Orders of this [court], those discovery responses would have demonstrated that the minor child's best interests will be served by modification of the Judgment herein to provide for the child to reside primarily with [Father], in Baltimore, subject to reasonable rights of access for [Mother], and that the minor child's best interests will be served by an award of her legal custody to [Father], all to ensure some modicum of stability and benefit for the child.

11

The court granted Father's motion on December 8, 2020. By this point, Mother had failed to answer two separate sets of interrogatories, had not appeared for her deposition (which had been noticed on three separate occasions), had not responded to two separate requests for production of documents, and had not produced a single document—irrespective of the court's orders requiring that she comply with discovery, including two orders that already imposed sanctions. Accordingly, the court's order stated, in full:

> Upon the Fourth Motion for Sanctions filed herein by [Father], and there being no response thereto filed herein by [Mother], there appearing good cause for the Motion, it is this **3rd of December, 2020** by the Circuit Court for Baltimore County and the same is hereby **ORDERED** that:
> 1. The Fourth Motion for Sanctions be and hereby []is **GRANTED**.
>
> 2. Lacking any other less severe sanction any longer available to the [c]ourt (all less severe sanctions having been utilized in connection with [Mother]'s prior failures and refusals to provide discovery) *the [c]ourt shall apply a rebuttable presumption in the trial of this case that the minor child's best interests will be served by a modification of the Judgment herein to grant [Father] her primary physical custody and her sole legal custody. Said presumption shall be rebuttable by [Mother] only upon presentation of evidence directly bearing on the best interests of the minor child, i.e., as provided in the prior sanctions Orders herein.*
>
> 3. [Father]'s request for attorney's fees in connection with the Fourth Motion for Sanctions be and hereby is **RESERVED** to trial on the merits.

(Bolded emphasis in original, italicized emphasis added).

Mother filed a "Motion to Reconsider" on January 6, 2021. Mother asserted that she had "intended to appear for the deposition" but her other daughter "began having problems again" and "there was a surge in Covid-19 cases." Mother requested that the deposition be rescheduled and that it be done "by telephone or by other electronically remote means."

12

The court denied Mother's motion for reconsideration on January 26, 2021.

### iv. *Second Request for Admissions*

In the interim, Father served Mother with a second request for admissions, which largely sought to confirm facts after Father's first request. Mother did not respond to Father's second request.

### Mother's Motion to Modify Custody and Child Support

Turning to Mother's offensive pleading, back in September 2020, she filed a "Motion to Modify Custody and Child Support" and alleged "material changes in circumstances that require a modification of the physical custody of S[.]" since the Judgment of Divorce. In her motion, she alleged that the travel contemplated in the Agreement is "very stressful for S[.]" and the COVID-19 pandemic made "any flying a danger to S[.] and to both parties." Because the schedule required S. to "miss nine (9) days of class each month of the school year," S.'s principal advised that "missing so much time will have an adverse effect on S[.]'s attendance and record." Accordingly, Mother claimed that it was in S.'s "best interests to be with [Mother] during the school year with [Father] having a more limited visitation schedule" and sought sole physical custody. She further sought modification of child support and responsibilities to pay transportation expenses.

Father moved to strike Mother's motion for failure to provide the financial disclosure forms required by Maryland Rules 9-202 and 9-203.[6] He responded to the allegation that S. "is flying cross-country every month," by asserting that "given [Mother]'s

---

[6] Before moving to strike, Father informed Mother of her requirement to provide a Rule 9-203(a) Financial Statement.

voluntary failure to exercise *any* of the Summer access periods afforded" or to "deliver and retrieve S[.] in alternate months during the 'School Year,' in practical application, S[.]'s actual travel has been limited to seven (7) roundtrips in the sixteen-plus (16+) months since the entry of the Judgment of Divorce."[7]

### Motion for Postponement

On the eve of trial, scheduled to begin on March 23, 2021, Mother moved to postpone, alleging that in early March she "started to not feel well and her condition has continued to worsen." In support, Mother submitted two letters: the first from the P3 Medical Group, dated March 11, recommending that Mother avoid frequent flying or walking; and the second, dated March 22, advising that Mother "cannot fly or travel until further evaluation." The court denied Mother's request for postponement on the record on the morning of trial. Over Father's objection, however, the court permitted Mother to participate remotely.

### Trial

The circuit court proceeded with a two-day trial in which it addressed four motions: (1) Father's amended and supplemental petition for contempt; (2) Mother's petition for modification of custody; (3) Father's petition for modification of custody and child support; and (4) Mother's motion for contempt.

---

[7] In connection with Mother's motion, she served interrogatories and requests for production of documents on Father. On November 5, 2020, Father filed answers to Mother's interrogatories and responded to her request for the production of documents.

Following opening arguments, Father testified first. He testified extensively to Mother's failure to comply with the travel and notification provisions of the Agreement. Among other things, he related that S. regularly traveled on "red eye" flights and that Mother did not "usually" travel with S. between Baltimore and Las Vegas as the Agreement contemplated.[8] On one occasion, S. returned to Baltimore on February 12 early in the morning without a winter coat and her school work, and had a "vicious sunburn" and damage to her feet. Father had to enlist care that morning because he did not receive travel information from Mother until "late in the evening on the 10th" and had morning conflicts. Due to the condition of S.'s feet and sunburn, Father contacted S.'s pediatrician and then took S. to the John Hopkins pediatric emergency room.

Father further testified that the Baltimore City Police Department and the Department of Social Services went to his home while S. was there to investigate allegations of physical child abuse on three occasions; twice in the summer immediately following the divorce and then again on October 24, 2020.[9] On each occasion, Father testified that there was no finding of abuse, and no further follow-up from the police or the Department of Social Services. Father then began to take pictures before returning S. to Mother to "document that she was not bruised, not beaten when [he] returned her."

---

[8] Instead, S. often traveled with Kim Gagnon, S.'s babysitter.

[9] Although is not clear from the record, the testimony implies that these allegations of physical child abuse were made by Mother.

Father added that Mother had only reported S.'s medical appointments "once or twice" after entry of the Judgment. Father concluded that S. is either "not getting medical care" or "she's getting it and I'm not getting the information."

Regarding his "Facetime" rights while in Mother's care, Father testified that he exercised his rights "every time" with the exception of one night in 2019 when he fell asleep "because we're a three hour time difference." Father also pointed out that of the 638 overnights since the date of divorce, that S. had been in his care for 414.

Following Father's testimony, counsel for Mother requested the court break to allow Mother to attend her medical appointment. The court excused the parties for the day to accommodate Mother's request.

When the parties reconvened, Mother began her testimony by describing her "typical day" with S. She maintained that the "highlight of [S.'s] day" was playing with her sister to whom she is "attached at the hip."

Mother explained that she had difficulty abiding with travel requirements in the Agreement for a variety of reasons. She had another child at home with health issues and also had health issues relating to her birth. Mother also asserted that pandemic restrictions made travel more difficult and that she just "couldn't afford it." She related that S.'s demeanor after returning from access periods with Father "varie[d]." Initially, S. "came home very angry" and was "scared to be alone." She would become aggressive.

Mother admitted that she traveled to Hawaii several times over the last year because her partner "stays in Hawaii for his company, his employer. And our health insurance and everything is moved there, so it requires us to go there on occasion." When questioned by

16

the court how she flies S. to Hawaii but cannot afford to travel to Baltimore, Mother responded that "the company pays for it."

Regarding the impact a potential change to the custodial arrangement would cause, Mother testified that S. "needs both of her parents." Mother urged that a change in custody "would cause [S.] emotional distress." In describing her relationship with S., Mother testified that "[s]he's my bestie. We do everything together. . . . We talk about everything." Finally, Mother testified that she did not plan to keep S. in her current public school but would "prefer her be in private school."

Ultimately, Mother did not proffer anything that was precluded on the issues of custody or child support. During Mother's direct examination, Father's objections to Mother's testimony based on the court's discovery sanctions were overruled. The judge explained that she was "going to hear about matters bearing on the child's best interests."

On cross-examination, among other things, Mother confirmed that she lived with the father of her second child in a home owned by him. When questioned how she could afford private school tuition if she could not afford flights to Baltimore, Mother responded that it "depended on what school it is," whether she receives support from Father, and whether she receives grants. When asked why she did not fly with S. back to Baltimore in November, Mother responded that she had her second child and that her partner was on another island.

### Determination of Initial Motions

At the conclusion of evidence related to whether there was a change of circumstances, Father made four motions. First, Father moved to strike Mother's motion

17

for child support, which was granted due to Mother's failure to file a financial disclosure.

Second, Father moved for "judgment on the issue of modification of custody, both petitions" and asserted that the presumption had not been rebutted. Mother's counsel urged, to the contrary, that it was not in the child's best interests to alter the custodial arrangement and that "there has been no evidence to show that there's been a significant detrimental [e]ffect on S[.]'s well being." Father's counsel responded that the court "granted the presumption . . . because it's the [c]ourt's burden, the [c]ourt's authority, the [c]ourt's responsibility to figure out the best interest of a child." Because Mother "behave[d] in a manner that can only be deemed to deny . . . the [c]ourt the ability to do its job, the [c]ourt must infer that it's sort of a variation of the empty chair rule."

The court then recounted the long procedural history and determined that a change in circumstances had occurred:

> [M]y decision in this case is not to punish anyone for not complying with court rules. That's not what we do in family law. It's -- everything is about the child's best interest.
> However I did indicate at the end of yesterday's proceedings that . . . it seemed to me as if the presumption that there had been a change in circumstances affecting S[.]'s best interest had occurred. And I can say now that [Mother's counsel] just told me that he will not be presenting any more testimony or evidence.
> After observing [Mother]'s, I'll just call it -- characterize it as frustrating testimony this morning, it's very clear to me there has been a change in circumstances. I don't need to rely on the presumption.
> There has been a change in circumstances since the parties entered into their [Agreement] that they signed in June of 2019 and that these changes have affected S[.]'s best interests.
> The chaos caused by [Mother] gives the [c]ourt great concern. I am thinking of [Father]'s testimony yesterday about just three access periods, December which ended up going into January and then February which was again troublesome, that's all I'll say about it, getting S[.] picked up.

18

The other thing that's change[d] is that Child Protective Services has been called three times and S[.] has been subjected to being woken up, most recently, I'll focus on that, in October of 2020, two days before the deposition was to have taken place.

And that's just not something that any child should be subjected to, let alone a child whose parents clearly don't communicate well. She's got enough to deal with, she doesn't need to be woken up in her home, taken from her bed and at one point taken to Hopkins for an examination and the other two times at least she was allowed to stay home.

But that in itself, those three calls are sufficient, I find, for me to find a change in circumstances affecting S[.]'s best interests.

The court also granted Father's consolidated contempt petitions, but denied a motion that Father had filed for a mental health evaluation, finding that Mother's testimony, although "somewhat bizarre," did not "rise[] to the level of a mental health evaluation."

### *Custody Determination*

In further consideration of the motion for modification, the court invited the parties to present additional testimony, relevant to S.'s best interests, before the court made a final custody determination. Father proposed an access schedule that he hoped would lead to "more orderly and reliable communication with regard to [S.'s] travel and exchanges." Mother's counsel confirmed that Mother did not wish to testify further on the issue of forward-going access and that Mother did not have any witnesses.

After closing arguments, the court delivered a lengthy ruling from the bench. At the outset, the judge reiterated that she believed her ruling to be in S.'s best interest and underscored that her decision was not reached based on Mother's failure to comply with various court orders and discovery rules. The court then proceeded to analyze each of the

19

factors set forth in *Montgomery County Department of Social Services v. Sanders*, 38 Md. App. 406, 420 (1977).

Among other things, the court found Father to be a "fit and proper parent" and a "very involved father." Although the judge noted that she could not opine as to Mother's fitness due to her unwillingness to engage in the litigation process, the court "drew inferences based on the testimony." The judge referenced, among other things, Mother's failure to pick up S. from her Father's custody for long periods of time, and the impact on S.'s ability to plan and achieve consistency.

The judge found Father's testimony consistent and credible and "his character appropriate for a concerned involved father." On the other hand, she found Mother's testimony "bizarre" and was concerned about Mother's truthfulness, finding that a "troubling character aspect." The trial judge found that the Agreement "began to fail almost immediately." While the court noted that Father is able to provide "structure and consistency" in S.'s life, she found that Mother "can't remember where she was last month or what day she got back from Hawaii last month." The judge noted that, although the Agreement contemplated that S. would spend 38 percent of custodial time with Father and 62 percent with Mother, in actuality, they flipped, and Father had S. for 65 percent of time.

The court then turned to whether joint custody was appropriate and reviewed the factors set forth in *Taylor v. Taylor*, 306 Md. 290 (1986). Among other things, the court found that Mother had "zero capacity to communicate with [Father], with the [c]ourt, with anyone, with the parent coordinator who has begged her to meet with her." The trial judge

specifically noted that granting sole legal custody to Father would allow him to "plan accordingly and provide the structure that . . . S[.] would truly benefit from."

After this determination, the court proceeded to establish a custody schedule.[10] Finally, the court granted Father's request to make his motion to modify child support retroactive to the date of filing and ordered the parties to be charged generally with support of S. while she is in their care. The judge memorialized her ruling in a written order entered on March 29, 2021. Mother noted a timely appeal.

## DISCUSSION

## I.

## Sanctions for Discovery Violations

### A. Parties' Contentions

Mother contends that the court abused its discretion in two orders relating to Mother's responses to Father's discovery requests. First, Mother avers that the "trial court abused its discretion in its Order of October 22, 2020 as to the sanctions imposed relative to [Mother]'s Responses to [Father]'s Request for Admissions." According to Mother, the court failed to specify, pursuant to Maryland Rule 2-424, that "an answer be served with respect to those requests." Mother asserts that the court abused its discretion in not giving Mother "an opportunity to serve answers to the requests to which she objected or to provide amended answers to the request to which she stated she could neither admit [n]or deny."

---

[10] The custody schedule granted Mother visitation for the following periods: Labor Day weekend; either Thanksgiving weekend or another weekend in November; Winter Break; Presidents' Day weekend; spring break; Memorial Day weekend; and four vacation weeks in the summer.

Second, Mother argues that the court abused its discretion when the court issued its December 3, 2020 order imposing a rebuttable presumption that S.'s best interests would be served by modification of the judgment to grant Father primary physical custody and sole legal custody. Quoting this Court's opinion in *A.A. v. Ab.D.*, 246 Md. App. 418, 444 (2020), *cert. denied*, 471 Md. 75 (2020), Mother argues that the "court has an absolute and overriding obligation to conduct a thorough examination of all possible factors that impact the best interests of the child" and that the "burden is on the moving party." She asserts that "[b]y switching that burden, requiring the non-moving party to rebut a presumption as to what is in the best interest of the child, the court has already made a finding without the moving party proving its case. [Mother] submits that this is an abuse of discretion."

Father counters that "[a] custody litigant cannot defeat the trial court's authority and responsibility to determine the best interests of a minor child, by refusing to provide any discovery whatsoever." According to Father, a court "must have the ability to address such conduct, to ensure protection of the <u>child's best interests</u>." (Emphasis in original). Father asserts that "it is the litigant parents' obligation to present to the trial court all the relevant evidence necessary to permit a knowing, informed and comprehensive judicial consideration and resolution of the custody issue."

Father contends that, "over a 14-month period," he "attempted, by every conceivable method, to discover the facts and information concerning his daughter's existence in Las Vegas, etc., and to otherwise learn the basis of [Mother]'s contention that S[.]'s best interests would be served by the *status quo* custody arrangement." According to Father, these "discovery efforts were effectively and completely ignored and/or

frustrated by [Mother], whose sole and obvious purpose was to *prevent* the trial court from determining S[.]'s best interests on a fully (or at all) informed basis." (Emphasis in original). Father posits that:

> Judge Cavanaugh did everything possible, *including imposition of the rebuttable presumption*, in an effort to achieve precisely [a thorough examination of all possible factors that impact a child's best interests] for S[.]'s benefit. It was not the trial judge, but [Mother] herself who, by all means possible, tried to prevent the circuit court from "*conducting a thorough examination of all possible factors that impact the best interests of the child*" []; and it was [Mother] herself who ultimately failed to present sufficient, persuasive evidence "*that bears directly on the best interests of the child*," to prevail on the issue, despite being afforded the opportunity.

(Emphasis in original). According to Father, were we to restrain the court's ability to impose a rebuttable presumption due to Mother's discovery deficiencies, we would "validate and endorse" Mother's "campaign of discovery avoidance, defeat entirely the efficacy of the discovery rules in custody cases and, most dangerously, tie the hands of every trial judge in attempting to determine the best interests of every minor child, rendering all such determinations subject to whatever scope of evidence each recalcitrant parent self-servingly elects to disclose, present or withhold."

In the alternative, even if the court abused its discretion in sanctioning Mother, Father avers that Mother was not prejudiced. Father points out that Mother does not "point to a single example, of where or how she was prevented or limited in making her presentation by any of the Orders of the trial court." "Far from being prejudicially precluded from submitting evidence, [Mother] was expressly invited, to testify further as to S[.]'s best interests, once the trial court determined a change of circumstances had occurred; but she affirmatively declined."

23

## B.    Discovery Sanctions in Child Custody Cases

We recently explained our standard of review concerning the imposition of discovery sanctions in child custody cases:

> Normally, we evaluate a trial courts' discovery sanction in a civil case through a well-defined lens—abuse of discretion. *Rodriguez v. Clarke*, 400 Md. 39, 57, 926 A.2d 736 (2007); *see also Das v. Das*, 133 Md. App. 1, 15, 754 A.2d 441 (2000) ("Abuse of discretion occurs 'where no reasonable person would take the view adopted by the [trial] court,' or when the court acts 'without reference to any guiding rules or principles.'" (quoting *North v. North*, 102 Md. App. 1, 13-14, 648 A.2d 1025 (1994))). However, before we look through that lens in a child custody case, we must be satisfied that the court has applied the best interests of the child standard in its determination. When the custody of children is the question, "the best interest[s] of the children is the paramount fact. Rights of father and mother sink into insignificance before that." *Kartman v. Kartman*, 163 Md. 19, 22, 161 A. 269 (1932).

*A.A. v. Ab.D.*, 246 Md. App. 418, 441 (2020), *cert. denied*, 471 Md. 75 (2020).

In a child custody case, "[i]t is a bedrock principle that when the trial court makes a custody determination, it is required to evaluate each case on an individual basis in order to determine what is in the best interests of the child." *Reichert v. Hornbeck*, 210 Md. App. 282, 304 (2013) (citing *Gillespie v. Gillespie*, 206 Md. App. 146, 173 (2012)). "[P]rocedural defects should not be corrected in a manner that adversely impacts the court's determination regarding the child's best interests." *A.A.*, 246 Md. App. at 446.

"Unfortunately, as happens in child custody cases, one or more parties may fail to comply with their discovery obligations." *Id.* at 442. Generally, Maryland Rule 2-433 offers two separate mechanisms through which a court may levy sanctions. *Warehime v. Dell*, 124 Md. App. 31, 54 (1998).

24

First, on the motion of a discovering party, the trial court may impose immediate sanctions if it finds a "failure of discovery" against the failing party. Md. Rule 2-433(a). A "failure of discovery" occurs when a party, among other things, "fails to serve a response to interrogatories under Rule 2-421 or to a request for production or inspection under Rule 2-422, after proper service." Md. Rule 2-432(a). Such sanctions include:

(1) An order that the matters sought to be discovered, or any other designated facts shall be taken to be established for the purpose of the action in accordance with the claim of the party obtaining the order;
(2) An order refusing to allow the failing party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence; or
(3) An order striking out pleadings or parts thereof, or staying further proceeding until the discovery is provided, or dismissing the action or any part thereof, or entering a judgment by default that includes a determination as to liability and all relief sought by the moving party against the failing party if the court is satisfied that it has personal jurisdiction over that party[.]

Md. Rule 2-433(a).

Second, when a party fails "to obey an order compelling discovery," the trial court may impose further sanctions under Maryland Rule 2-433(c):

If a person fails to obey an order compelling discovery, the court, upon motion of a party and reasonable notice to other parties and all persons affected, may enter such orders in regard to the failure as are just, including one or more of the orders set forth in section (a) of this Rule. If justice cannot otherwise be achieved, the court may enter an order in compliance with Rule 15-206 treating the failure to obey the order as a contempt.

Even in the absence of a particularized rule or statute, trial courts inherently have the power "to definitively and effectively administer and control discovery." *Gallagher Evelius & Jones, LLP v. Joppa Drive-Thru, Inc.*, 195 Md. App. 583, 596 (2010) ("Even if . . . the precise action taken by the circuit court is not specifically prescribed by a rule or

25

statute, the court has the ability, in general, to definitively and effectively administer and control discovery, as the Maryland Rules contemplate." (cleaned up)). On the whole, "[t]rial judges are vested with great discretion in applying sanctions for discovery failures," *Rodriguez v. Clarke*, 400 Md. 39, 56 (2007), and our review is "quite narrow," *Sindler v. Litman*, 166 Md. App. 90, 123 (2005) ("[A]ppellate courts are reluctant to second-guess the decision of a trial judge to impose sanctions for a failure of discovery."). "When a court exercises its discretion by balancing and weighing the rights, interests, and reasons of the parties, the court is not required to discuss each factor considered," *Hossainkhail v. Gebrehiwot*, 143 Md. App. 716, 725 (2002), and is "not required to set out in detail each and every step of his [or her] thought process," *Thomas v. City of Annapolis*, 113 Md. App. 440, 450 (1997).

While we require that parties substantially comply with their discovery obligations, "we also expect parties to resolve their known discovery disputes promptly, either informally or by using the mechanisms available under the . . . discovery rules." *Watson v. Timberlake*, 251 Md. App. 420, 434 (2021), *cert. denied*, 476 Md. 281 (2021). "Ultimately, discovery sanctions are not to operate as a windfall, but instead are intended to relieve the surprise or prejudice a party suffers when his opponent fails to abide by the discovery rules." *Id.* at 437. The "more draconian sanctions, of dismissing a claim or precluding the evidence necessary to support a claim, are normally reserved for persistent and deliberate violations that actually cause some prejudice, either to a party or to the court." *Butler v. S&S P'ship*, 435 Md. 635, 650 (2013) (quoting *Admiral Mortg., Inc. v. Cooper*, 357 Md. 533, 545 (2000)).

26

In a child custody case, the discretion of the trial court to exclude evidence is not only measured by the potential prejudice to the parties, but is constrained by a court's "absolute and overriding obligation to conduct a thorough examination of all possible factors that impact the best interests of the child." *A.A.*, 246 Md. App. at 444. In *A.A.*, we analyzed the balance between the court's discretion and this "absolute and overriding obligation." *Id.* There, father propounded document requests and interrogatories upon mother in connection with his motion for modification of custody of the parties' two children. *Id.* at 426. Father moved to compel, asserting that mother failed to respond fully to his interrogatories and "barely produced anything in th[e] case." *Id.* at 426-27. After mother failed to timely respond, father sent a second motion to compel and then moved in limine to exclude the testimony of witnesses for whom mother had failed to provide contact information as well as any documentary evidence mother failed to provide. *Id.* at 427. The court granted father's motion, and, as a result, at trial mother was precluded from calling witnesses and limited to introducing only documents that her counsel produced in response to father's document requests. *Id.* at 429, 432-33. Her testimony was limited to the subjects on which she provided detail in her responses to discovery. *Id.* at 430-31. The court "sustained objections relating to Father's contributions to the children's private school education, Mother's attempt to involve Father in the children's homeschooling program, and how sharing physical custody would affect the children's education" because the testimony sought was outside of these subjects. *Id.* at 432.

On appeal, we held the trial court erred when it excluded evidence as a discovery sanction without first examining whether that evidence could have assisted the court in

27

deciding what custody arrangement was in the children's best interests. *Id.* at 447. The court did not assess the evidence that mother intended to offer, which may have included details regarding a protective order and allegations of abuse, which, in turn, may have weighed directly on father's fitness for custody. *Id.* at 447-48. Without this evidence, the court was unable to fully determine father's fitness to have custody of the children. *Id.* at 448.

Notwithstanding the court's authority to exclude evidence willfully withheld by a party in violation of discovery requests, we highlighted that, "in a child custody case, the court has an absolute and overriding obligation to conduct a thorough examination of all possible factors that impact the best interests of the child[ren]. . . . This supreme obligation may[, therefore,] restrain the court's broad authority to exclude evidence as a discovery sanction." *Id.* at 444. Reaffirming the principles espoused in *Flynn v. May*, 157 Md. App. 389 (2004), and *Wells v. Wells*, 168 Md. App. 382 (2006), two cases detailing the necessary procedural safeguards in the context of default judgments, we observed that "procedural defects should not be corrected in a manner that adversely impacts the court's determination regarding the child's best interests." *A.A.*, 246 Md. App. at 446.

We stressed that the trial court "is in the unique position to marshal the applicable facts, assess the situation, and determine the correct means of fulfilling a child's best interests." *Id.* at 447 (quoting *Baldwin v. Baynard*, 215 Md. App. 82, 108 (2013)). "Plainly, a child's best interests are best attained when the court's decision is as well-informed as possible." *Id.* We concluded:

28

[T]he court's independent obligation to the child[ren] requires that, before ordering the exclusion of evidence as a sanction, the court should take a proffer or otherwise ascertain what the evidence is that will be excluded, and then assess whether that evidence could assist the court . . . in its determination of the best interests of the child[ren]. When the court completes this assessment, we review any discovery sanction it imposes thereafter for an abuse of discretion.

*Id.* at 448-49.

## C.    Analysis

We conclude that the discovery sanctions imposed by the circuit court in this child custody case were consistent with the Maryland Rules and our decisional law. We hold that the circuit court did not err or abuse its discretion by its choice of sanctions because, rather than bar evidence that could bear directly on S.'s best interests, the court safeguarded S.'s "indefeasible right" to have her best interests fully considered. *A.A.*, 246 Md. App. at 422 (citing *Flynn*, 157 Md. App. at 410).

Initially, we observe that the court's sanctions were permissible under the Maryland Rules and were not disproportionate to Mother's almost complete failure to produce any discovery.[11] In fact, the sanctions were not the most severe that the trial court could have

---

[11] Mother does not challenge the court's consideration of the *Taliaferro* factors before us. *Taliaferro v. State*, 295 Md. 376, 390-91 (1983). We note that Mother also did not address the factors below at trial or in any response to motions she now challenges on appeal. We conclude, under the circumstances of this case, that the court's sanctions were appropriate and proportionate, given Mother's pervasive and repeated discovery failures.
    Generally, after determining that a discovery violation has occurred, the following six factors, first set forth in *Taliaferro*, inform the court's determination of an appropriate sanction:
        (1) whether the disclosure violation was technical or substantial;
        (2) the timing of the ultimate disclosure;
        (3) the reason, if any, for the violation;

(Continued)

29

imposed under Maryland Rule 2-433. Without recapping the entirety of Mother's

discovery violations, we note, for example, that Mother's initial failure to respond to

interrogatories and requests for production of documents constituted a "failure of

discovery" under Maryland Rule 2-432(a), allowing the court to impose immediate

sanctions. The court, instead, afforded Mother an additional 22 days to provide written

responses in a written order. Despite multiple chances to respond to Father's

interrogatories or document requests, Mother simply failed to respond altogether. *See*

*Warehime v. Dell*, 124 Md. App. 31, 48 (1998) (A party's "failure to answer interrogatories

[is] a substantial, not a technical, discovery violation.").

---

      (4) the degree of prejudice to the parties respectively offering and opposing
          the evidence;
      (5) whether any resulting prejudice might be cured by a postponement; and,
      (6) if so, the overall desirability of a continuance.

*Id.* at 390-91 (cleaned up). "[I]t is not necessary for the court to go through a checklist and note its consideration for each factor." *Muffoletto v. Towers*, 244 Md. App. 510, 542 (2020), *cert. denied,* 469 Md. 276 (2020). Indeed, these factors "frequently" "overlap" and "do not lend themselves to a compartmental analysis." *Id.* (quotation omitted). Accordingly, "[w]e do not look at each incident in isolation, but rather at the entire history and context of the case in reviewing the trial court's decision[.]" *Valentine-Bowers v. Retina Grp. of Wash., P.C.*, 217 Md. App. 366, 380 (2014). While it is helpful for our review when trial judges explain their application of each factor, we "presume judges to know the law and apply it, even in the absence of a verbal indication of having considered it." *Aventis Pasteur, Inc. v. Skevofilax*, 396 Md. 405, 426 (2007) (quoting *Wagner v. Wagner*, 109 Md. App. 1, 50 (1996)).

     In any event, applying the *Taliaferro* factors here, we observe that Mother's failure to show up for her deposition or respond to almost all discovery requests and court orders, without good reason, amounted to substantial violations of the discovery process. As to the prejudice factor, Father was prejudiced by Mother's continued failure to provide information relating to S.'s life while in Mother's care and that he required to prepare for trial. Finally, Mother's track record throughout the case offered the court no reason to believe that she would start cooperating with any further postponements.

During the time Mother was ignoring discovery requests and defying the court's orders, she did file her own offensive pleadings through her lawyer. And, the record indicates, she was able travel to Maryland and to Hawaii during the same span of times her deposition was noted. After giving Mother multiple opportunities to comply with discovery, the judge imposed sanctions progressively as permitted under Maryland Rule 2-433.

Maryland Rule 2-433(a) outlines the potential sanctions that a circuit court may impose when it finds a failure of discovery. This list is not exhaustive; in addition to its authority under this Rule, a circuit court "also has the power to impose sanctions as part of the court's inherent power to control and supervise discovery." *A.A.*, 246 Md. App. at 443; *see also Gallagher Evelius & Jones, LLP v. Joppa Drive-Thru, Inc.*, 195 Md. App. 583, 596 (2010) ("Even if . . . the precise action taken by the circuit court is not specifically prescribed by a rule or statute," the court has the authority to administer and control discovery).

The list of potential sanctions in Rule 2-433(a) includes "[a]n order that the matters sought to be discovered, or any other designated facts shall be taken to be established for the purpose of the action in accordance with the claim of the party obtaining the order[.]" In other words, a circuit court has the authority to impose a conclusive, un-rebuttable presumption of fact in favor of the party seeking discovery in an appropriate case. *See, e.g.*, *Billman v. State of Md. Deposit Ins. Fund Corp.*, 86 Md. App. 1, 14, 21 (1991).

Here, the circuit court imposed a lesser version of that sanction, and it did so in a way that was designed to ensure that it remained "as well-informed as possible" as to S.'s best interests. *A.A.*, 246 Md. App. at 447. Rather than imposing a conclusive presumption as to S.'s best interests, the court imposed a *rebuttable* presumption that S.'s "best interests will be served by a modification of the Judgment . . . to grant [Father] her primary physical custody and her sole legal custody." The court's decision to allow Mother the opportunity to rebut the presumption is consistent with our decision in *A.A. v. Ab.D.*, where we resolved that "the best interests of the child . . . is the leading consideration for the court in deciding whether to preclude a party from introducing evidence as a discovery sanction in a child custody case." *Id.* at 422. Regarding her answers to admissions, Mother objected to the vast majority of requests relating to her income, the validity of the Agreement, the period before the Judgment of Divorce, and aspects of her life in Nevada. While Mother assured the court that she would amend her answers within seven days of her response, she did not do so. The court's sanction was not ordered until after the seven days expired.

The purpose of discovery is to "eliminate, as far as possible, the necessity of any party to litigation going to trial in a confused or muddled state of mind, concerning the facts that gave rise to the litigation." *Warehime*, 124 Md. App. at 48 (quoting *Balt. Transit Co. v. Mezzanotti*, 227 Md. 8, 13 (1961)). By utterly failing to comply with her obligations, Mother acted in a manner inconsistent with the purposes of discovery. We conclude that the sanctions were "proportionate to the discovery abuse," *Rodriguez v. Clarke*, 400 Md. 39, 70 (2007), and discern no error or abuse of discretion.

Mother presses that the court erred in imposing the rebuttable presumption because it shows "the court has already made a finding without the moving party proving its case," thereby thwarting the court's obligation to thoroughly examine all possible factors that impact S.'s best interests. We are not persuaded.

The facts of this case stand in stark contrast to *A.A.* Whereas in *A.A.*, the mother sought to introduce evidence of Father's past conduct but was foreclosed by the court, 246 Md. App. at 447-48, the Mother here stymied both the Father and the court's efforts to obtain information bearing on S.'s best interests.

We hold that the trial court contended with Mother's incessant discovery violations properly by fashioning sanctions that, among other things, restricted her ability to present evidence at trial that she failed to produce in discovery without barring any evidence necessary for the court to consider in making a custody determination in S.'s best interests. Indeed, the trial judge expressly preserved Mother's ability to present "evidence directly bearing on the best interests of the minor child" in her orders imposing sanctions. At trial, and over Father's objections, the court permitted Mother to present testimony and any other evidence that she had (although she presented none) bearing on S.'s best interests. On appeal, Mother has not identified any evidence bearing on S.'s best interests that she was precluded from offering at trial.

## II.

## Custody Modification

### A.     Parties' Contentions

Mother asserts that the "trial court was clearly erroneous in finding that there was a material change of circumstances."  According to Mother, her inability to travel with S. to Maryland and the fact that "Child Protective Services had been called three times" are not material changes.  Mother appears to be asserting that, because S. "has spent time with both parties" and "continued to go to school when at either parties' home," S.'s circumstances had not materially changed.  Therefore, relying on *Wagner v. Wagner*, 109 Md. App. 1, 29 (1996), Mother asserts that the court erred in modifying custody when there was no material change in circumstances.

Father responds that "the record is replete with evidence supporting the finding of change of circumstances."  According to Father, the two examples listed by Mother in her brief, the "travel schedule" and the "involvement of Child Protective Services," "by themselves ***would*** be sufficient to support [the court]'s finding that S[.]'s circumstances had materially changed since the date of divorce.  But the body of ***other evidence***, both as presented by [Father] in his case-in-chief and in [Mother's] testimonial response . . . are far more than sufficient to support the trial court's conclusion that S[.] had been deprived of the post-divorce existence . . . contemplated."  (Emphasis in original).

## B.     Framework for Modification of Child Custody

We review a court's child custody determinations utilizing three interrelated standards of review. *In re Yve S.*, 373 Md. 551, 586 (2003). The Court of Appeals described this review as follows:

> We point out three distinct aspects of review in child custody disputes. When the appellate court scrutinizes factual findings, the clearly erroneous standard of [Rule 8-131(c)] applies. [Second], if it appears that the [court] erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the [court] founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the [court's] decision should be disturbed only if there has been a clear abuse of discretion.

*Id.* (cleaned up). "In our review, we give 'due regard . . . to the opportunity of the lower court to judge the credibility of the witnesses'" and recognize the discretion of the trial court to "award custody according to the exigencies of each case." *Gillespie v. Gillespie*, 206 Md. App. 146, 171 (2012) (quoting *In re Yve S.,* 373 Md. at 584, 585-86).

The Family Law Article grants the circuit court continuing equitable jurisdiction over custody matters, Maryland Code, (1984, 2019 Repl. Vol.), Family Law Article, § 1-201(c). The statute provides: "In exercising its jurisdiction over the custody, guardianship, visitation, or support of a child, an equity court may: . . . (4) from time to time, set aside or modify its decree or order concerning the child." "Because the court retains continuing jurisdiction over the custody of minor children, no award of custody or visitation, even when incorporated into a judgment, is entirely beyond modification, and such an award therefore never achieves quite the degree of finality that accompanies other kinds of judgments." *Frase v. Barnhart*, 379 Md. 100, 112 (2003).

35

While custody orders are never final, a request to modify an order should emphasize changes in circumstances since the last order. *Gillespie*, 206 Md. App. at 171-72 ("The burden is then on the moving party to show that there has been a material change in circumstances since the entry of the final custody order and that it is now in the best interest of the child for custody to be changed." (quoting *Sigurdsson v. Nodeen*, 180 Md. App. 326, 344 (2008))). Our courts engage in a two-step process when presented with a request to modify an existing custody order. *Id.* at 170. First, the circuit court must assess whether "there has been a material change in circumstances." *Green v. Green*, 188 Md. App. 661, 688 (2009). "A material change of circumstances is a change of circumstances that affects the welfare of the child." *Gillespie*, 206 Md. App. at 171. Second, should the court find a material change in circumstances, "the court then proceeds to consider the best interests of the child as if the proceedings were one for original custody." *Id.* at 170 (quoting *McMahon v. Piazze*, 162 Md. App. 558, 594 (2005)). The trial court is thus required to evaluate each case on an individual basis to determine what is in the best interests of the child. *Wagner v. Wagner*, 109 Md. App. 1, 39 (1996).

In analyzing the best interests of the child, we are guided by the factors articulated in *Montgomery County Department of Social Services v. Sanders*, 38 Md. App. 406, 420 (1977), and, with particular relevance to the consideration of joint custody, *Taylor v. Taylor*, 306 Md. 290, 304-11 (1986). In *Sanders*, this Court listed ten non-exclusive factors: (1) fitness of the parents; (2) character and reputation of the parties; (3) desire of the natural parents and agreements between the parties; (4) potentiality of maintaining natural family relations; (5) preference of the child; (6) material opportunities affecting the

36

future life of the child; (7) age, health, and sex of the child; (8) residences of parents and opportunity for visitation; (9) length of separation from the natural parents; and (10) prior voluntary abandonment or surrender. 38 Md. App. at 420.

In *Taylor*, the Court of Appeals enumerated thirteen specific, non-exclusive factors, including some that overlap with the *Sanders* factors: (1) capacity of the parents to communicate and to reach shared decisions affecting the child's welfare; (2) willingness of parents to share custody; (3) fitness of parents; (4) relationship established between the child and each parent; (5) preference of the child; (6) potential disruption of child's social and school life; (7) geographic proximity of parental homes; (8) demands of parental employment; (9) age and number of children; (10) sincerity of parents' request; (11) financial status of the parents; (12) impact on state or federal assistance; and (13) benefit to parents. 306 Md. at 304-11.

Courts are not limited by any particular list of factors but are instead vested with wide discretion in making decisions concerning the best interests of children. *Azizova v. Suleymanov*, 243 Md. App. 340, 345 (2019); *see also Taylor*, 306 Md. at 303 (in noting "transcendent importance" of child's best interests, stating that no one factor "has talismanic qualities, and that no single list of criteria will satisfy the demands of every case" (citation omitted)).

### C. Material Change of Circumstances

In this case, the trial judge explained in detail the basis for her determination that a material change in circumstance had occurred since the parties signed the Agreement and that "these changes have affected S[.]'s best interests." The trial judge specifically found

that the "chaos" in S.'s life caused by Mother raised "great concern." In support, the court referenced three access periods when Mother failed to abide by the Agreement and pick up S.[12] Specifically, the court referenced the "troublesome" February drop-off before Father's access period with S. On that occasion, S. arrived in Baltimore early in the morning without a winter coat and her school work, and had a "vicious sunburn" and damage to her feet. In addition, the court found that the repeated involvement of Child Protective Services interfered with Father's care and impacted S.'s welfare and best interests. Significantly, the court noted that, while the Agreement contemplated that S. would spend 38 percent of custodial time with Father and 62 percent with Mother, in actuality, Father had S. for 65 percent of the time that had elapsed since the Agreement was signed.

Viewing the record as a whole, we conclude that there was sufficient evidence to support the trial court's conclusion that a material change of circumstances had occurred. The evidence at trial highlighted that the parties' Agreement simply was not working. Father testified extensively to Mother's failure to comply with the travel and notification provisions of the Agreement. Echoing Father's testimony, Mother explained that she had difficulty abiding by the Agreement for a number of reasons. These reasons included her other child's health issues, her own health issues, the cost, and that her "life wasn't flexible in that nature." Mother's consistent difficulties in complying with the Agreement's travel

---

[12] Mother also alleged that a material change in circumstances required a modification of custody in her September 21, 2020 "Motion to Modify Custody and Child Support." Mother claimed that the travel contemplated in the Agreement is "very stressful for S[.]" and that the pandemic made flying dangerous and prevented S. from getting into a routine.

provisions resulted in S. residing with Father for almost twice as long as the Agreement contemplated. The circuit court's conclusion that this change in the intended operation of Agreement impacted S.'s best interest by forestalling her ability to plan and achieve consistency was reasonable.

Mother argues that these changes are not material because S. spent time with both parties and continued to go to school. We disagree. We can envision few changes more material to a child's best interests than the unilateral action of one parent to disregard a custody arrangement and leave a child with the other parent for an indeterminate period without good cause. As the court found, such changes deprived S. of the stability that every child craves.

### D.     Modification of Custody

Turning to the trial court's custody determination, Mother does not present any argument or assign error in the court's decision to grant Father primary physical and sole legal custody of S. Accordingly, we need not restate in detail each of the court's findings or explicate the court's consideration of each the factors set forth in *Sanders*, 38 Md. App. at 420, and *Taylor*, 306 Md. at 304-11. We further note, when presented with the opportunity to present testimony regarding the modification of custody, Mother declined.

In brief and without belaboring the point, we observe that the trial court thoroughly analyzed each of the *Taylor* and *Sanders* factors in considering the appropriate custody arrangement. For example, the trial court noted that Father could provide "structure and consistency" in S.'s life. In considering joint custody, the court found that Mother had "zero capacity" to communicate with anyone, including Father, or the parent coordinator.

The court found that granting Father sole custody would allow him to "plan accordingly and provide the structure that . . . S[.] would truly benefit from."

Having reviewed and considered the entire record, we conclude that the circuit court did not abuse its discretion in modifying the custody arrangement. After hearing two days of evidence regarding compliance issues with the Agreement and considering the best interests of S., the court reasonably concluded that sole legal and primary physical custody with Father was in S.'s best interests. The court's findings were supported by the record and not clearly erroneous. Accordingly, we conclude that the court did not abuse its discretion in determining that a material change of circumstances had occurred and in granting Father sole legal and physical custody of S., subject to Mother's visitation rights.

### III.

### Contempt

Mother argues that that "the court abused its discretion when it failed to find [Father] in contempt for failing to pay child support." According to Mother, Father "unilaterally" stopped paying child support without a court order or agreement with Mother. After the court "ran the numbers with the actual percentages of the time the minor child was with each parent," the court determined that "there would still be child support owed of $1,111.00 per month." According to Mother, this resulted in arrears in the amount of $13,332.00. Mother submits that she "still incurred expenses" in caring for S. when she was in her custody and that the court abused its discretion in "not awarding the arrears as calculated by the court."

40

Father, relying on *Pack Shack, Inc. v. Howard County*, 371 Md. 243, 254 (2002), responds that "there is no right of appeal by a party who unsuccessfully seeks to have another party held in contempt." Father concludes: "independent of the validity of the trial court's determination (consistent with the statute) to retroactively modify child support to the date of the filing of [Father]'s request . . .[,] there is simply no right of appeal available to [Mother] in this circumstance and she cannot obtain any relief." We agree.

Generally, unless constitutionally authorized, "[t]he right to appeal in this State is wholly statutory." *Pack Shack, Inc.*, 371 Md. at 247. Our "statutory scheme is structured to confer a broad, general right of appeal, that subsequently is limited by enumerated 'exceptions.'" *Id.* at 249. The "general right of appeal," *id.*, is codified at Maryland Code (1973, 2020 Repl. Vol.), Courts & Judicial Proceedings Article ("CJP"), § 12-301, and provides:

> ***Except as provided in § 12-302 of this subtitle***, a party may appeal from a final judgment entered in a civil or criminal case by a circuit court. The right of appeal exists from a final judgment entered by a court in the exercise of original, special, limited, statutory jurisdiction, unless in a particular case the right of appeal is expressly denied by law. In a criminal case, the defendant may appeal even though imposition or execution of sentence has been suspended. In a civil case, a plaintiff who has accepted a remittitur may cross-appeal from the final judgment.

(Emphasis added). Section 12-302 clarifies that the general appeal right "does not apply to appeals in contempt cases, which are governed by § 12-304 of this subtitle[.]" CJP § 12-302(b). In turn, CJP § 12-304(a) states: "Any person may appeal from any order or judgment passed to preserve the power or vindicate the dignity of the court and adjudging

41

him in contempt of court, including an interlocutory order, remedial in nature, adjudging any person in contempt, whether or not a party to the action."

In construing section 12-304, the Court of Appeals has explained that the statute "clearly and unambiguously limits the right to appeal in contempt cases to persons adjudged in contempt." *Pack Shack*, 371 Md. at 254. The statute establishes two prerequisites: section 12-304 requires the order or judgment to be passed, first, to "preserve the power and dignity of the court" and, second, "to have adjudged the person appealing in contempt of court." *Id.*

Here, Mother does not have a right to appeal as "the party who unsuccessfully sought to have the other adjudged in contempt." *Kemp v. Kemp*, 42 Md. App. 90, 101 (1979), *rev'd on other grounds*, 287 Md. 165 (1980). Accordingly, Mother's appeal of the court's finding that Father was not in contempt is not properly before us.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**